PETER TALILI, ELIZABETH TALILI, FILEMU TALILI;
MALAGAMALII ALIITU, and BINGHAM TALILI

v.

SATELE MOMOSEA, FRANCIS FOMA'I, and their agents.

High Court of American Samoa
Land and Titles Division

LT No. 18-86

February 20, 1987

Before REES, Chief Justice, OLO, Associate Judge,
and VAIVAO, Associate Judge.

Counsel: For Plaintiffs, Charles Ala'ilima
For Defendants, William Reardon

This case began about a hundred years ago. At that time there came to be two holders of the Satele title, who may at first have been rival claimants but eventually shared the title. This gave rise to the development of two quite distinct and assertive branches of the family, and

to two competing sets of claims to family lands and titles.

One of the two joint titleholders, Satele Pili, died about 1900 and from that time Satele Uga reigned alone for almost forty years. Upon the death of Satele Uga the two branches of the family disagreed over who should become Satele. The High Court awarded the title to Teutusi, the son of Satele Uga; his rival had been Faga, the son of Satele Pili. Faga v. Moso'oi, 1 A.S.R. 375 (1937).

The two branches were in court again the very next year over ownership of Tomea, the land involved in this case. The court held that Tomea had been "the matai land of Satele Pili" but that all lands formerly under the authority of either titleholder were now subject to the authority of Satele Teutusi. Satele v. Faga, 2 A.S.R. 26 (1938). The court stressed, however, that "the matai does not own the family lands for his own benefit," but is "a sort of trustee in whose name the family lands are held for the benefit of the family members." Id. at 27. Since the "beneficial interest" in the land had been in the Satele Pili branch of the family, the court held Tomea to be Satele family land reserved for the use of the Satele Pili branch of the family.

In 1975 the court reaffirmed this unusually explicit judicial allocation of land to some family members over against others. In Satele v. Naea, L.T. 1544-75, the incumbent Satele (a member of the Uga branch of the family) had given his permission for a separation agreement so that part of Tomea could become the individual property of a family member. Several members of the Pili branch--- including Momosea, the defendant in the current litigation --- objected on the ground that the person on whose behalf the separation agreement was filed was a member of the Uga branch. The court upheld the objection, citing the 1938 decision.

In 1984, however, in a lawsuit among essentially the same parties as this one, the court held that the situation had changed. The Satele title was vacant, the most recent incumbent having been shot to death by a dissatisfied member of the family shortly after the decision was announced. Momosea and other Pili descendants sued to enjoin the construction of a house on Tomea by the some of the current plaintiffs. The court noted that since 1938 "the Faga family (descendants of Satele Pili) have allowed others to use the land for many years.

24

It is a little late to undo the results of this inaction on their part. The court will not prohibit anyone now on the land from remaining there." Satele v. Talili, L.T. 19-84, at page 2. The ultimate decision about the allocation of Tomea was held to be "a problem [the] new Satele must wrestle with." Id.[1]

The new Satele, as things turned out, was none other than Momosea. The court decision awarding him the title represented a dramatic shift in the fortunes of the respective branches of the family. The Pili branch, which had been excluded from the title for all but five years since 1900, would no longer need to rely on the courts to defend the frontiers of the 1938 decision against Uga ambitions. Even if Tomea had not been specially reserved for his branch of the family, Momosea would now have broad authority as sa'o to allocate the use and the fruits of Satele property.

Peter Talili and his relatives must have presented an inviting target. Although Peter Talili's father is a blood member of the Satele family who lived on Tomea as a boy, he had left in 1952 to join the service. Another Talili relation, Tau, had continued to occupy part of the land along with some of her relatives; but the Talili presence had increased suddenly with the return of Peter and his father to the territories in the early 1980s. The defendants complain that during this time, when there was no Satele to restrain him, Peter had appropriated more and more of Tomea to his own use, treating it essentially as his individual property rather than as family land. Adding insult to injury, the Talili litigants in the 1984 case claimed that Tomea did not belong to the Satele family at all, but to a family in Futiga to which they also belong.

Accordingly, in May of 1986 Peter and his family were visited by bulldozers. These had been sent by Satele Momosea to begin the process of transforming a half-acre or so of Talili breadfruits and coconuts into a house for Momosea's sister. This litigation followed.

Despite the complicated history of the case, both the facts and the law are reasonably clear. Our only difficulty is in fashioning a decree that

[1]. See also Momosea v. Talili, L.T. 29-77; Talili v. Foma'i, L.T. 72-79.

25

will encourage people who are not very closely related and who do not at present particularly like each other to live in harmony as members of a communal family. In the hope that the parties themselves could accomplish this, at the conclusion of the trial we encouraged them to meet with each other and to let the court know whether a settlement had been reached. Since the proposed meetings seem not to have taken place, we proceed to the following findings of fact, conclusions of law, and order:

FINDINGS OF FACT

1. The plaintiffs are blood members of the Satele family. It was the uncontroverted testimony of Filemu Talili that his great-grandfather was Satele Titae, a titleholder who preceded the split between the Pili and Uga branches. Other testimony on both sides clearly established that people acknowledged by the defendants to be family members who have resided on family lands are closely related to the Talili family.

2. Various Talili relatives have long occupied part of Tomea. We need not decide whether, as the plaintiffs maintain, the land was originally given to them by their Futiga relatives "in order to serve Satele," or whether they were first allowed to move onto the land by a Satele.

3. Although the Talili litigants have rendered service to Satele by making contributions to some family fa'alavelave through a Satele matai, such service has been grudging and sporadic. It may not even have come to the attention of Satele Momosea, and it does not seem to have been in proportion to the benefits Peter Talili and his family have received from Satele land.

4. Although Peter may have taken advantage of the vacancy in the Satele title to cultivate more land than had been recently cultivated by his family, there is no evidence that he appropriated any land that had been recently cultivated by other family members.

5. Peter Talili's estimate that the crops destroyed by the bulldozer were worth $300,000 was a vast overstatement. He claimed that this half acre had contained at least 60 coconut trees, 500 taro plants, 15 to 20 mature breadfruits, 100 banana trees, as well as ava, pandanus, and orange trees. Although we acknowledge that Samoa was the

26

actual historic location of the Garden of Paradise, we are unwilling to find the defendants guilty of having destroyed it on the basis `of Mr. Talili's unsupported testimony. We find the testimony of Francis Foma'i, to the effect that the bulldozer destroyed about fifteen coconut trees, four or five breadfruit trees, and no new plantations, to be far more credible.

6. In building his own house, which was done without authorization from anyone entitled to speak for the whole Satele family, Peter cleared an area at least as large and valuable, and with plantings of approximately the same kind, as the area cleared by Satele for his sister's house.

7. The destruction of the Talili crops was authorized by Satele without consultation with the family members who were affected, and without assigning them any other land or giving any other form of compensation.

CONCLUSIONS OF LAW

1. We reaffirm the court's holding in L.T. 19-84 to the effect that the Satele Pili family must respect the right of other Satele family members who have long lived on parts of Tomea to continue to do so.

2. The right of a family member to occupy a particular piece of family land, however, is not absolute. The sa'o can reallocate the land within the family provided that he provides the displaced family members with some other equivalent land. See, e.g., Ifopo v. Vaiao, 2 A.S.R. 472 (1949); Tiumalo v. Lio, 3 A.S.R. 176 (1955).

3. Moreover, the right of a family member to use family land for economic purposes is subject to the right of the sa'o, acting as trustee for the family, to call on all family members to render service in proportion to their ability (with particular respect to the value of the fruits of their occupancy) and to the needs of the family. See Tago v. Faleulu, 3 A.S.R. 370 (1958).

4. The sa'o of a family should not, however, take a major step with regard to family land without prior consultation with the family, and particularly with the family members directly affected. "This is the Samoan way of life---discussions, discussions, and discussions in a good

faith effort to iron out disputes." <u>Fairholt v. Aulava</u>, 1 A.S.R. 2d 73, 78 (1983).

<u>ORDER</u>

Satele shall consult with the plaintiffs before proceeding with the proposed construction. The plaintiffs shall meet with him on any reasonable terms he proposes. If (as has been reported to the court since the trial) one or more of the plaintiffs is unavailable for an extended period, the others shall meet with Satele. The parties shall attempt in good faith to reach a mutually acceptable result, bearing in mind that Satele has the ultimate right to allocate family land subject to the obligation to provide alternative land to displaced family members.

At the conclusion of such negotiations, the plaintiffs should have the right to cultivate approximately the same amount of land as they were cultivating immediately prior to the bulldozing. The right to use this land is, of course, conditional in many ways. In particular, respect and service must be rendered to Satele in full accordance with Samoan custom.

Subject to these conditions, the preliminary injunction is dissolved, the further relief in the complaint and in the countercomplaint is denied, and the action is dismissed.